# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**DESIREE DAWN HAAG,**

            **Plaintiff,**

**v.**                                                            **No. CIV-15-987 LAM**

**CAROLYN W. COLVIN, Acting Commissioner**
**of the Social Security Administration,**

            **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff's ***Motion to Reverse and Remand to Agency for Rehearing, with Supporting Memorandum*** (*Doc. 18*), filed April 19, 2016 (hereinafter, "motion"). On June 20, 2016, Defendant filed a response (*Doc. 21*) to Plaintiff's motion and, on July 7, 2016, Plaintiff filed a reply (*Doc. 22*). In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to have the undersigned United States Magistrate Judge conduct all proceedings and enter a final judgment in this case. *See* [*Docs.* 3 and 11]. The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record. [*Doc. 15*]. For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **GRANTED** and the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") should be **REMANDED**.

.

# I.   Procedural History

On December 16, 2011 (*see Doc. 15-7* at 2), Plaintiff protectively filed an application for Supplemental Security Income (hereinafter "SSI"), alleging that she was disabled due to "[a]ttachment disorder, mental disorder, [PTSD] and depression" (*id.* at 6).   Plaintiff's application was denied at the initial level on February 21, 2012 (*Doc. 15-4* at 2), and at the reconsideration level on November 5, 2012 (*id.* at 13).   On December 10, 2012, Plaintiff requested a hearing to review the denial of her application.   [*Doc. 15-5* at 12].   Administrative Law Judge Michelle K. Lindsay (hereinafter "ALJ") conducted a hearing on December 17, 2013. [*Doc. 15-3* at 37-66].   At the hearing, Plaintiff was present, represented by attorney Feliz M. Martone, and testified.   *Id.* at 39, 42-60.   Vocational Expert Mary Diane Weber (hereinafter "VE") was also present and testified.   *Id.* at 39, 60-65.

On May 13, 2014, the ALJ issued a decision (*id.* at 21-31) finding that, under the relevant sections of the Social Security Act, Plaintiff was not disabled from the date her application was filed (*id.* at 31).   Plaintiff requested that the Appeals Council review the ALJ's decision.   *Id.* at 14-17.   On August 27, 2015, the Appeals Council denied Plaintiff's request for review on the ground that there was "no reason under our rules to review the [ALJ]'s decision."   *Id.* at 3.   This decision was the final decision of the Commissioner.   On November 2, 2015, Plaintiff filed her complaint in this case.   [*Doc. 1*].

# II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v.   Astrue*,   522 F.3d 1093, 1096   (10th Cir. 2008)   (citing   *Hamilton v.   Sec'y   of*

*Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted); *Doyal*, 331 F.3d at 760 (citation and quotation marks omitted). An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted). While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

### III.   Applicable Law and Sequential Evaluation Process

For purposes of SSI, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).   In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim. 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).   At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) the claimant's impairment(s) meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. § 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261.   At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his or her residual functional capacity (hereinafter "RFC"), age, education, and work experience.   *Grogan*, 399 F.3d at 1261.

### IV.   Plaintiff's Age, Education, Work Experience, and Medical History; and the ALJ's Decision

Plaintiff was born on May 2, 1989, and was 22 years old on December 16, 2011, the date she filed her disability application.   [*Doc. 15-7* at 2].   Thus, for the purposes of her disability

claim, Plaintiff is considered to be a "younger person."[1]   Plaintiff stated that the highest level of school she had completed was either seventh or eighth grade (Compare *Doc. 15-3* at 43 with *Doc. 15-7* at 7), that she had been in special education classes for much of that time (*Doc. 15-13* at 4), and does not have a GED (*Doc. 15-3* at 43).   Plaintiff has never had a driver's license (*id*.), but can read and understand English (*Doc. 15-7* at 5).   Plaintiff was last employed in 2008, when she worked at Taco Bell, but she quit working there because she felt she had not been paid for all of the hours she had worked and because she "wasn't able to keep up with anyone else."   *Id*. at 52.

Plaintiff's medical records include:   an assessment and recovery plan dated January 9, 2012 from Transitional Living Services, Inc. (*Doc. 15-9* at 3-31); progress notes for the period from November 21, 2011 to January 30, 2012 (*Doc. 15-10* at 26-34) and the period from August 1, 2012 to September 24, 2012 (*Doc. 15-12* at 6-12) from Parvaneh F. Bakhtiar, M.D. and State of New Mexico Disability Determination Services; neuropsychological evaluation report dated May 8, 2013 from Robert J. Thoma, Ph.D. (*Doc. 15-13* at 2-16); treatment records for the period from July 12, 2013 to December 12, 2013 from Psychiatric Nurse Practitioner, Jayanna Warwick, PMHNP-BC, and Epoch Behavioral Health (*Doc. 15-14* at 40-52); and general medical examination notes dated September 12, 2013 from Presbyterian San Mateo (*Doc. 15-16* at 6-12). Where relevant, Plaintiff's medical records are discussed in more detail below.

---

[1] *See* 20 C.F.R. § 404.1563(c) (defining a "younger person" as "under age 50").

At step one of the five-step evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the filing of her disability application on December 16, 2011, although she had received some income in both 2012 and 2013 "as part of a 'scheme' devised by the father of her child in order to get money coming in."   [*Doc. 15-3* at 23]. At step two, the ALJ found that Plaintiff has the following severe impairments:   "post-traumatic stress disorder; a depressive disorder; generalized anxiety disorder; borderline intellectual functioning; and a personality disorder, not otherwise specified."   *Id.*   At the third step, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" found in 20 C.F.R. Part 404, Subpt. P, Appx 1  (20 CFR §§ 416.920(d), 416.925, and 416.926)."   *Id.*   The ALJ considered Listings 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders), and 12.08 (Personality Disorders),[2] and determined that Plaintiff has mild restriction in her activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and has experienced no episodes of decompensation of extended duration.   *Id.* at 24.   From those findings, the ALJ concluded that Plaintiff's impairments did not satisfy the criteria of either Paragraph B (severity of mental limitations) or Paragraph C (durational and functional requirements) of the Listings considered.   *Id.* at 24-25. Before step four, the ALJ found that Plaintiff had the RFC:

---

[2] *See* 20 C.F.R. Part 404, Subpt. P, Appx. 1, beginning at 12.01 (Mental Disorders).   Oddly, although the ALJ considered Plaintiff's "borderline intellectual functioning" to be a "severe" impairment, she did not consider Listing 12.05 (Intellectual Disability).

> [T]o perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is limited to understanding, remembering, and carrying out only simple instructions; able to maintain attention and concentration to perform simple tasks for two hours at a time without requiring redirection to task; requires work involving no more than occasional changes in the routine work setting; can have only occasional contact with the general public; can have only superficial interactions with co-workers; cannot perform tandem tasks; and cannot perform assembly-line pace work.

*Id*. at 25.   In support of this RFC assessment, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."   *Id*. at 26.

At step four, the ALJ found that Plaintiff "has no past relevant work."   *Id*. at 29.   At step five, the ALJ found that jobs that exist in significant numbers in the national economy that Plaintiff can perform.   *Id*. at 30.   In support of this finding, the ALJ relied on the VE's testimony that an individual who could "perform work at all exertional levels [but was] compromised by non-exertional limitations" as described by the ALJ, could perform several representative jobs, including laundry folder, housekeeper, hand-packager, dishwasher, and table worker.   *Id*. Therefore, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act "since December 16, 2011, the date the application was filed."   *Id*. at 31.

## V.   Analysis

Plaintiff is now 27 years old.   She has a seven year-old son fathered by her former fiancé, who was abusive to Plaintiff (*Doc. 15-13* at 4-5), does not provide child support (*Doc. 15-3* at 59), and manipulated her into participating in a scheme in which she allegedly got paid to provide home health care for an individual, but did not actually do the work (*id.* at 44-45, 59-60).   Plaintiff's then-fiancé kept most of the money that resulted from that scheme, while Plaintiff lost both her

dependent benefits and her food stamps.   *Id*.   Plaintiff reported that she was sexually abused by her father from the age of 7 to the age of 15.   [*Doc. 15-13* at 4].   When she was a young teen, her father imprisoned her in a bedroom in his house for approximately a year-and-a-half, while reporting to her school that he was home-schooling her.   *Id*.   The abuse was discovered by authorities after Plaintiff escaped to a neighbor's house and police were summoned.   *Id*.   This abuse resulted in Plaintiff's post-traumatic stress disorder (hereinafter "PTSD"), which is well-documented in her medical records.   *See, e.g.,* [*Doc. 15-9* at 5; *Doc. 15-12* at 24; *Doc. 15-14* at 17, 44].   Plaintiff also has a "borderline" IQ of 74.   [*Doc. 15-13* at 7].   At the time of the hearing, Plaintiff was receiving therapy and taking classes at Transitional Living Services (hereinafter "TLS").   [*Doc. 15-3* at 45-46].   She was also receiving psychiatric treatment at Epoch Behavioral Health, and her therapist there, psychiatric nurse practitioner Jayanna Warwick,[3] was prescribing her medications.   [*Doc. 15-3* at 46-47; *Doc. 15-14* at 39-52].   TLS was also providing a home healthcare aide to Plaintiff for 16 hours per week, who helped her with daily activities like cooking and cleaning.   [*Doc. 15-3*. at 50-51; *Doc. 15-8* at 19].

Plaintiff argues in her motion that the ALJ erred by not properly evaluating:  (1) the medical opinion of examining consultant, Robert J. Thoma, Ph.D. (*Doc. 18* at 8-9); (2) Plaintiff's credibility (*id*. at 10-13); and (3) Plaintiff's ability to interact with supervisors (*id*. at 13).   In response, Defendant asserts that (1) the ALJ's credibility assessment of Plaintiff is supported by substantial evidence (*Doc. 21* at 9-12); (2) Dr. Thoma's opinion was reasonably considered and

---

[3] Plaintiff refers to Ms. Warwick as "Janet."   *See* [*Doc. 15-3* at 47].

weighed (*id*. at 12-14); and (3) Plaintiff's ability to deal with supervisors was accounted for in both the ALJ's RFC and the VE's selection of jobs (*id*. at 14-15).   In her reply, Plaintiff emphasizes that the ALJ "picked and chose portions from the record" to support a finding that Plaintiff is not disabled, and that the ALJ insufficiently tied her findings to the record evidence.   [*Doc. 22* at 2].

### A.   The ALJ's Assessment of Dr. Thoma's Opinion

On April 26, 2013, Plaintiff was evaluated by Robert J. Thoma, Ph.D., an associate professor and clinical neuropsychologist at the University of New Mexico School of Medicine, on a referral by Janette Gomez, BSCSW, Plaintiff's case manager/social worker from TLS. [*Doc. 15-13* at 2].   The evaluation "was requested in order to assess [Plaintiff's] current level of functioning, to assist in differential diagnosis, and to make treatment recommendations."   *Id*.   In the course of his evaluation, Dr. Thoma spent two hours conducting a face-to-face clinical interview that involved both Plaintiff and Ms. Gomez, and four hours administering standardized testing to Plaintiff and giving feedback.   *Id*. at 16.   This was followed by seven hours of scoring and interpreting the testing results and preparing a report.   *Id*.   During the four-hour testing portion of the evaluation, Dr. Thoma administered all of the following tests:  Wechsler Adult Intelligence Scale-Third Edition; Wide Range Achievement Test-Fourth Edition; Repeatable Battery for the Assessment of Neuropsychological Status; Trail Making Test, Parts A & B; Wisconsin Card Sorting Test; Grip Strength Test; Grooved Pegboard; Beck Depression Inventory-Second Edition; and Personality Assessment Inventory.   *Id*. at 5.   Plaintiff's full-scale IQ score on the Wechsler scale was 74, which Dr. Thoma indicated was "in the borderline range." *Id*. at 7.

In Dr. Thoma's thirteen-page report he indicated, among other things, that Plaintiff

is suffering from a debilitating level of depression and anxiety.   It is quite possible that her depression may affect her ability to concentrate and attend as she tries to learn new skills or accomplish tasks.   Her present PTSD diagnosis is based on the traumatic sexual and physical abuse she suffered as a child and[,] as a result, the nightmares and other symptoms have become part of her everyday experience.

*Id*. at 11-12.

With respect to that report, the ALJ noted that Dr. Thoma had assessed Plaintiff with a GAF of 30[4] and had also considered Plaintiff to be disabled from competitive employment, evaluations that the ALJ deemed "clearly based on [Plaintiff]'s subjective symptoms." [*Doc. 15-3* at 29].   The ALJ also indicated that Dr. Thoma's GAF score "seems to be based on [Plaintiff]'s lack of housing, finances, employment, support, and education" and, therefore, gave his opinion regarding Plaintiff's mental impairments "very little weight."[5]   *Id*.   The ALJ similarly declared that "Dr. Thoma's diagnosis of a psychotic disorder was based solely on [Plaintiff]'s allegations of hallucinations rather than objective findings on examination," because, "although [Plaintiff] reported she experienced hallucinations at times, she denied experiencing any

---

[4] The GAF (Global Assessment of Functionality) score is intended to provide a measurement of the clinician's judgment of an individual's psychological, social and occupational functioning, but not impairment in functioning due to physical or environmental limitations.   DSM-IV-TR at 32.   A score in the range of 21 to 30 is said to indicate "serious impairment in communication or judgment" or "inability to function in almost all areas."   *Id*. However, "naked reliance on the GAF score" impermissibly ignores the medical source's narrative notes.   *Groberg v. Astrue*, 415 F. App'x 65, 69 (10th Cir. 2011) (unpublished).   Moreover, "[t]he most recent edition of the DSM omits the GAF scale" for reasons that include "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."   *Richards v. Colvin*, No. 15-6121, 2016 WL 556745, at *4 (10th Cir. Feb. 12, 2016) (unpublished) (although GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy).

[5] Assigning "little weight" to a medical source's opinion effectively rejects it.   *See, e.g., Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012).

hallucinations during the testing session and did not appear to be distracted by internal stimuli upon examination."  *Id*. citing *Doc. 15-13* at 13.

Dr. Thoma's opinion was the only examining medical source opinion in the record, as no treating source opinions were provided.   The only other opinions were from state agency non-examining sources, which the ALJ failed to weigh at all.   Rather, the ALJ noted only that her own determination was "consistent with the opinions of State Agency medical consultants who have also found [Plaintiff] is not disabled."  *Id*. at 28.   The ALJ followed that statement with boilerplate language to the effect that, as non-examining sources, the agency doctors' "opinions are not entitled to controlling weight, but must be considered and weighed as those of highly qualified physicians who are experts in the evaluation of the medical issues in disability claims under the Social Security Act."  *Id*., citing Soc. Sec. Rep. 96-6p, 1996 WL 374180.   However, she did not actually assign any weight to the agency doctors' opinions.   ALJs are required to both assign weight to such medical opinions and explain in their opinion why that weight is given. 20 C.F.R. § 416.927(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist"). Although this failure, alone, is grounds for remand, the problems with the ALJ's consideration of Dr. Thoma's opinion are far more serious.

The "reasons" stated by the ALJ for assigning "little weight" to Dr. Thoma's opinion do not withstand even minimal scrutiny.   The ALJ states, for example, that Dr. Thoma's "diagnosis of a psychotic disorder was based solely on [Plaintiff]'s allegations of hallucinations rather than objective findings on examination."  [*Doc. 15-3* at 29].   To begin with, "Psychotic Disorder

NOS [not otherwise specified in DSM-IV]" was only one of four diagnoses that Dr. Thoma assigned to Plaintiff.[6]   The others were PTSD, Depressive Disorder NOS, and Generalized Anxiety Disorder."   [*Doc. 15-13* at 13].   The ALJ's focus on only one diagnosis is not sufficient to account for her rejection of the entire opinion.   Moreover, Dr. Thoma is a neuropsychologist, who considered numerous objective test results, in addition to his subjective impressions of Plaintiff, and he stated in the paragraph leading up to his diagnoses that "[t]he presence of psychotic symptoms (*reported* hallucinatory experiences) *suggests* adding a diagnosis of Psychotic Disorder NOS."   *Id.* (emphasis added).   By this statement, Dr. Thoma acknowledged that he did not observe any hallucinations, which is not surprising since Plaintiff reported that she had hallucinations "at times," and specifically denied experiencing any during Dr. Thoma's testing.   *Id.* at 6.   In addition, Dr. Thoma reported that "standard validity scales suggest that [Plaintiff] presented herself accurately (i.e., neither over- nor under-reported symptomatology)," and that "[h]er resulting clinical profile *is significant for elevations on clinical scales sensitive to* depression, anxiety and *psychosis*."   *Id.* at 11 (emphasis added).   Thus, Dr. Thoma did not rely entirely on Plaintiff's subjective reports with respect to the diagnosis of psychosis.   Even if he had, however, an examining psychologist's opinion cannot be dismissed simply because it is based

---

[6] The diagnosis of "Psychosis NOS" was also made by Jayanna Warwick, PMHNP-BC in September 2013. [*Doc. 15-14* at 45].   Although Ms. Warwick is a psychiatric nurse practitioner, and therefore not considered to be an "acceptable source" that can *establish* an impairment, 20 C.F.R. § 416.913(a), her treatment notes offer independent support for Dr. Thoma's diagnosis, yet were not discussed by the ALJ, despite the Administration's mandate that opinions from "other" (*i.e.,* "not acceptable") medical sources, such as nurse practitioners, "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."   Soc. Sec. Rep. 06-03p, at *3.

partly on subjective reports, as "[t]he practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements."   *Thomas v. Barnhart*, 147 F. App'x 755, 759 (10th Cir. September 2, 2005) (unpublished).   Doing so "impermissibly substitutes [the ALJ's] judgment for that of [the medical professional]."   *Id*. at 759-60.

The ALJ also found fault with Dr. Thoma's assessment of Plaintiff's GAF at 30.   First, nothing in Dr. Thoma's report supports the ALJ's declaration that his assessment of Plaintiff's GAF was based solely on extrinsic factors such as housing, finances, and education.   [*Doc. 15-3* at 29].   Additionally, the ALJ indicated that she had assigned "very little weight" to low GAF ratings by other medical providers, as well, based on what she described as Plaintiff's "conscious attempts to portray limitations that are not actually present in order to increase the chance of obtaining benefits and the fact that her daily activities are far greater than these GAF ratings suggest."   *Id*.   On the other hand, the ALJ rejected third party function reports by Ms. Gomez, Plaintiff's social worker, based, at least in part, on higher GAF scores assigned by treating psychiatrist, Parvaneh F. Bakhtiar, M.D.,[7] during the eight-month period between Ms. Gomez' two reports.   The ALJ also discounted even lower GAF scores "ranging from 40 to 50" that she

---

[7] Those scores were assessed by Dr. Bakhtiar on August 1, 2012 (GAF 65) (*Doc. 15-12* at 11) and on September 24, 2012 (GAF 55) (*id*. at 6).   Ms. Gomez' third-party function reports were submitted on February 7, 2012 (*Doc. 15-7* at 21-28) and on October 5, 2012 (*id*. at 48-55).   As such, only one of Ms. Gomez' reports is even arguably temporally relevant to the GAF scores upon which the ALJ relied, since the October 5, 2012 function report was within eleven days of the September 24, 2012 GAF score.   A score of 55 is supposed to indicate the clinician's judgment that the subject has "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning" (DSM-IV-TR at 32), which may be essentially what Ms. Gomez reported, as well.   However, the ALJ simply dismissed the third-party reports without discussing either how they conflicted with the GAF scores or the context and time within which those scores were assigned.   Moreover, although Dr. Bakhtiar was a treating, acceptable medical source, the *only* thing the ALJ relied on from her treatment notes were those two GAF scores.

stated were "frequently received" by Plaintiff, based on what she described as Plaintiff's "conscious attempts to portray limitations that are not actually present" and Plaintiff engaging in "far greater" daily activities "than these GAF ratings suggest."   *Id*.   This reliance on GAF scores when they are high, but not when they are low, constitutes impermissible "picking and choosing" of facts that support the ALJ's own opinion.[8]

An ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."   Soc. Sec. Rep. 96-8p at *7, 1996 WL 374184.   The ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," and the RFC assessment must always consider and address medical source opinions.   *Id*.   Because the ALJ must consider the whole record, she is prohibited from picking and choosing "among medical reports, using portions of evidence favorable to h[er] position while ignoring other evidence."   *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (citation and internal quotation marks omitted).   When there are multiple opinions regarding medical severity and functional ability from different sources, the ALJ must explain the weight given to each source's opinions.   *Hamlin*, 365 F.3d at 1215 (citation omitted).

---

[8]The ALJ appears to assign undue significance to GAF scores generally, both by discounting opinions that include GAF scores that are lower than might be expected from her RFC, and by using higher GAF scores as evidence of higher levels of functioning than claimed.   However, it is important to keep in mind that "a GAF score is a snapshot of an individual's current condition and is not designed for adjudicative determinations."   *Matheson v. Colvin*, 2013 WL 1566733, at*3 n.2 (D. Utah April 12, 2013) (unpublished), citing DSM–IV–R at 32-34.   Moreover, the usefulness of the GAF scale has itself been questioned by the very organization it is intended to serve.   *See* n.3, *supra*.

Unfortunately, the ALJ's treatment of Dr. Thoma's thorough, detailed, and objective analysis appears to be based on her own personal opinion rather than on the record, as it is not tied in any way to specific medical evidence.   ALJs gather evidence from a variety of sources and turn it into a coherent statement of the salient facts of the claimant's case and, ultimately, into a RFC assessment.   *See* SSR 96-8p at *5 ("[t]he RFC assessment must be based on *all* of the relevant evidence in the case record").   To the extent that evidence conflicts, ALJs are also required to consider and weigh that evidence in order to resolve the inconsistencies.   *Id*. at *7 (resolution of any inconsistencies in the evidence as a whole must be included in narrative discussion). Significantly, however, an ALJ is not a physician, and may not substitute her judgment for that of an acceptable medical source.   *Hua v. Astrue*, 2009 WL 524991, at *3 (D. Colo. Mar. 2, 2009) (unpublished) (discrediting medical source's entire opinion, including objective findings, was "improper attempt to substitute [ALJ's] judgment for that of the medical practitioner").   There are numerous resources upon which ALJs may rely for assistance with their consideration of medical evidence, including 20 C.F.R. § 416.927, the Administration's own statement of the manner in which medical opinions are to be considered.   That regulation details what is essentially a hierarchy applicable to "acceptable medical source" [9] opinions.   At the highest point are "treating" sources, whose opinions are entitled to "controlling weight," so long as they are well-supported by medically acceptable techniques and are not inconsistent with the other

---

[9] "Only 'acceptable medical sources' can provide evidence to establish the existence of a medically determinable impairment, only they can provide medical opinions, and only they can be considered treating sources." *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citations omitted).   "Acceptable medical sources" include both licensed physicians and licensed or certified psychologists.   20 C.F.R. § 416.913(a).

substantial evidence.   20 C.F.R. § 416.927(c)(2).   Here, the parties agree that Dr. Thoma was an "examining" source, which is the next lower level on the hierarchy. § 416.927(c)(1). Non-examining sources, such as the initial and reconsideration level psychologists in this case, are entitled to the least weight.  *Id*.  *See also Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all") (citations omitted).   If an ALJ departs from this hierarchy, she is required to "give good reasons" for doing so, and her reasons must be specific enough "to make clear to any subsequent reviewers the weight the [ALJ] gave . . . and the reasons for that weight."  *Id*. at 1082 (citation omitted).   "In the absence of findings supported by specific weighing of the evidence in the record, the ALJ leaves the Court unable to assess whether relevant evidence adequately supports her conclusion."  *Mendoza-Martinez v. Colvin*, No. CV 14-1151 CG, 2016 WL 795743, at *4 (D. N.M. February 25, 2016) (unpublished), citing *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

Because this Court concludes that the ALJ did not follow the correct legal standards in considering the medical evidence and, specifically, her consideration of the opinion of Dr. Thoma, this case must be reversed and remanded for further proceedings.

### B.   Plaintiff's Additional Arguments

Plaintiff makes two additional arguments in support of remand, which are that the ALJ improperly evaluated her credibility and failed to address her limitations with respect to interactions with supervisors.   Because this Court has determined that the ALJ failed to properly weigh and explain the reasons for the weight given to Dr. Thoma's opinion, and that Plaintiff's motion for remand must, therefore, be granted, those additional grounds for reversal will not be

addressed here.   The Court finds that it is unnecessary to address Plaintiff's additional claims as they may be affected by the proceedings on remand.   *See Robinson*, 366 F.3d at 1085 (declining to reach the plaintiff's step five claims because they may be affected by resolution of the case on remand); *Lopez v. Astrue*, 371 F. App'x. 887, 889 and 892 n.6, (10th Cir. March 29, 2010) (unpublished) (remand for failure to articulate the weight given to treating physicians' opinions renders consideration of claims regarding ALJ's reliance on VE testimony unnecessary, since such issues may be affected by treatment of the case on remand) (citing *Robinson*, 366 F.3d at 1085).

## VI.   Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision should be remanded for proper evaluation of the medical evidence.

**IT IS THEREFORE ORDERED** that Plaintiff's ***Motion to Reverse and Remand to Agency for Rehearing, with Supporting Memorandum*** *(Doc. 18),* is **GRANTED** and the Commissioner's decision in this case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order**.**   A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

*Lourdes a. Martinez*
_____
**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**